# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Mar 19, 2025
s/ K. Reed
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.  25  MJ  42 |
| Records re: the Cellular Telephone Assigned Call Number (414) 510-9095 ("the SUBJECT PHONE") as further described in Attachment A | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

see Attachment A,

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371; 1958; & 924c | Murder for hire; Discharge of a firearm during a crime of violence; and felon in possession of a firearm. |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jacob Dettmering, FBI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____telephone_____ *(specify reliable electronic means)*.

Date:  03/19/2025

_____
*Judge's signature*

City and state:  Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, **Jacob A Dettmering**, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone assigned call number **(414) 510-9095**, ("the SUBJECT PHONE"), that is stored at premises controlled by **AT&T**, a wireless telephone service provider headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach Florida. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require **AT&T** to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

2.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since January 7, 2018. I was assigned to the FBI Capital Area Gang Task Force (CAGTF) in Baton Rouge, Louisiana from June 15, 2018, to April 1, 2020. Since April 1, 2020, I have been assigned as the Task Force Coordinator for the Milwaukee Area Safe Streets Task Force (MASSTF). Since 2018, I have investigated violations of federal law, directed drug and street gang investigations, obtained, and executed search and arrest warrants related to the distribution of illegal narcotics, violent incident crimes, and debriefed confidential informants and cooperating defendants. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal offenses.

1

3. I have experience in the investigation, apprehension, and prosecution of individuals involved in federal criminal offenses, the use of cellular devices to commit those offenses, and the available technology that can be used by law enforcement to assist in identifying the users of cellular devices and their location.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and therefore does not set forth all of my knowledge about this matter.

5. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1958 & 2(a) (murder for hire and conspiracy to commit murder for hire) and §§ 924(c)(1)(A)(iii) & 2(a) (discharge a firearm during a crime of violence) have been committed by **LAWRENCE TURNER**. There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

## PROBABLE CAUSE

7. Since June of 2020, case agents with the Federal Bureau of Investigation (FBI) in coordination with the Milwaukee Police Department (MPD) and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), have been investigating identified members of the violent street gang, Wild 100s, aka Shark Gang, including Lawrence TURNER, for federal firearms and fraud offenses.

2

8. Based upon review of MPD reports, information provided by confidential sources, and review of publicly available social media posts, beginning in approximately July of 2020, members of the Wild 100s, aka Shark Gang, became involved in an ongoing feud with members of the Ghetto Boys Clique (GBC), aka Swindle Gang. Since that time, multiple homicides, shootings, and instances of illegal possession and transfer of firearms, including the possession of fully automatic firearms, that is machineguns, have occurred and are suspected to be associated with the ongoing gang feud.

9. Among many other shootings, Wild 100s members eventually focused their attention to Keyon STEWART (DOB: 08/25/1998), a member of GBC. STEWART made comments over social media referencing the homicide of Wild 100s gang member Raymond COLON and shooting of Teshae HANNA on March 15, 2021. Since STEWART's comments, there have been several attempted shootings of him by several Wild 100s gang members and associates. As will be described below, the homicide of Nassor Buford (Stewart's close associate) was motivated by this feud.

10. On April 5, 2021, at approximately 9:30 pm, Milwaukee Police Officers were dispatched to a shot spotter activation and 911 call for a shooting at 4908 W Center Street, Milwaukee, WI. Upon arrival of the first arriving squad, Officers located Nassor BUFORD, B/M 07/19/2000, laying on the step of the residence with several obvious bullet wounds. Paramedics arrived and pronounced Buford deceased at approximately 9:42pm. Investigators recovered eleven (11) .45 caliber spent shell casings and two (2) 9mm spent shell casings from the scene. Once the shell casings were entered into inventory, they were examined by ATF certified Forensic Technology Certified IBIS Technician. This technician determined that the recovered .45 caliber casing was linked to NIBIN Master Index Case Number: 5714.

11.     Throughout the course of the investigation, Homicide Investigators determined that Buford was supposed to be meeting with someone outside his residence to purchase some marijuana.  The phone number identified that was communicating with BUFORD at the time of the Homicide was determined to be a text now number.  Investigators served legal process on text now and ended up determining that the person who utilized the TextNow number was Ronnie JACKSON, M/B, 12/16/1999.

12.     Investigators utilized pole camera footage and other surveillance footage to identify the vehicle that was used for the Homicide, which was later determined to be a Zip Car, which has an internal GPS tracking system.  Investigators were able to track the vehicles travel throughout the evening of the Homicide and marry that information up with the cell phone location for JACKSON during the same time.  Investigators determined that the vehicle location and JACKSON's phone location were co-located at numerous locations throughout the course of travel.

13.     JACKSON was arrested by the U.S. Marshals and Milwaukee Police in Houston, Texas and was charged with first-degree intentional homicide in state court.  During this time, Investigators with the FBI Gang Task Force were investigating 30-members of the Wild 100s criminal street gang for fraud, firearm crimes and murder for hire, including the homicide of BUFORD by JACKSON and BOWMAN. In April 2023, JACKSON, along with 29 others, were indicted for various violations of federal law in the Eastern District of Wisconsin (see 23-CR-77).

14.     In October of 2024, JACKSON participated in a proffer protected interview with case agents. During this interview, JACKSON admitted to the homicide of BUFORD and gave specific details of the homicide.  Additionally, JACKSON identified TURNER as being a front seat passenger and second shooter for the homicide.  JACKSON stated they were each promised

4

and paid $10,000 from Ronnell BOWMAN to kill BUFORD. JACKSON also confirmed that BUFORD was targeted because he was closely associated with STEWART, with whom the Wild 100s were actively feuding as described above.

15. JACKSON stated TURNER utilized a .45 caliber Glock pistol with a machine gun conversion device (MCD) and a 9mm Glock pistol with an MCD to kill BUFORD. NIBIN results from the .45 caliber spent shell casings from the Homicide matched Master Case Index 5714, which includes the shell casings recovered from November 9, 2020, and December 12, 2020, shot spotter activations at 2500 N 21st Street, Milwaukee, WI, and a January 20, 2021, shooting which struck the vehicle in the alley behind 3158 N 52nd Street, Milwaukee, WI.

16. Investigators know that during the relevant time, Keyon STEWART was known to frequent and reside in and around the area of 21st Street and Wright, which was the location of the first two referenced shootings. Investigators also believe that STEWART was the intended target of the shooting in the alley on North 52nd Street. Investigators know Wild 100s members were actively trying to kill STEWART during this time, and likely thought STEWART was the one driving his sister's vehicle at the time of the shooting. Additionally, investigators know that the victim of the homicide, BUFORD, was a friend and close associate of STEWART at the time of his death.

17. During the related fraud investigation, your affiant reviewed records from TURNER's Cash-App account. Those records revealed that on April 6, 2021 (the morning after the above-mentioned homicide) TURNER updated the account phone number on his Cash-App from 414-712-0545 to 414-510-9095 (SUBJECT PHONE).

18. Your affiant has reviewed a variety of Instagram records recovered in this investigation and is aware that Turner's Instagram screenname was "__rtm__". In one Instagram

5

return, your affiant observed a conversation where "__rtm___" provided number 414-712-0545 as his own phone number on March 12, 2021. Your affiant reviewed another Instagram message, where another Wild 100s member instructed an individual looking to purchase drugs to "Call my n**** Lawrence phone hold on" and then provided the phone number 414-712-0545.

19. Your affiant obtained a historical cell-site data search warrant for 414-712-0545 from the Honorable Magistrate Judge William Duffin on October 17, 2024 (see 24-MJ-214). The data obtained from that warrant indicated TURNER was in Milwaukee near the scene of the Homicide on April 5, 2021.

20. A review of a law enforcement database showed that 414-510-9095 (SUBJECT PHONE) started service with AT&T on February 21, 2021, and was still in service at the time of the Homicide on April 5, 2021. Your affiant has sent a subpoena to AT&T for subscriber information, but the results have yet to be returned. Furthermore, your affiant knows that it is common practice for gang members to conceal the true subscriber of the telephone they are utilizing to aid in the nefarious activities being conducted.

21. Your affiant participated in proffer protected interview which occurred on November 8, 2024, with JACKSON. During that interview, JACKSON told investigators that TURNER was paid by BOWMAN for the April 5, 2021, Homicide with a prepaid California unemployment debit card. TURNER reportedly got the card once he got back from Houston, Texas where he was with BOWMAN following the Homicide.

22. During the above-mentioned fraud investigation, law enforcement has gathered a large volume of evidence relating to fraudulent California unemployment prepaid debit card use. In some instances, this includes location information such as the address the debit cards were delivered to and or the locations the card was used at.

6

23. Your affiant believes that by obtaining historical cell-site data for the SUBJECT PHONE, case agents may be able to further corroborate JACKSON's statement of being together with Turner on April 5, 2021 as well as corroborating JACKSON's statement of TURNER getting the pre-paid debit card as payment by cross referencing the SUBJECT PHONE's tower locations against data about the debit cards delivery addresses and use for the time frame following the homicide and through July 1, 2024. Based on the entirety of the investigation your affiant believes that the sought records from this time frame are likely to contain evidence useful in tying the movements of TURNER to payment for the homicide via prepaid debit card use.

24. Further, your affiant believes that the records requested from the SUBJECT PHONE's start of service date (February 21, 2021) up to and including the date of the homicide will be useful to determine if the SUBJECT PHONE and (414) 712-0545 were both being actively used by TURNER *prior* to the homicide, if both phones routinely travelled together, and in documenting phone call connections between the conspirators in this case.

25. In my training and experience, I have learned that **AT&T** is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site

7

data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

26. Based on my training and experience, I know that **AT&T** can collect cell-site data about the SUBJECT PHONE. I also know that wireless providers such as **AT&T** typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes. Your affiant previously submitted a preservation request with AT&T and also knows that AT&T retains the information identified in Attachment B for a period of five-years which covers the time period requested.

27. Based on my training and experience, I know that wireless providers such as **AT&T** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as **AT&T** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the SUBJECT PHONE's user or users and may assist in the identification of co-conspirators and/or victims.

8

## AUTHORIZATION REQUEST

28.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

29.     I further request that the Court direct **AT&T** to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on **AT&T**, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## ATTACHMENT A
### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number **(414) 510-9095** ("the Account"), that are stored at premises controlled by **AT&T** ("the Provider"), headquartered at 11760 U.S. Highway 1, Suite 300, North Palm Beach Florida.

9

## ATTACHMENT B
### Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period **February 21, 2021 to July 1, 2021**:

    a.   The following subscriber and extended subscriber information about the customers or subscribers of the Account:

        i.   Names (including subscriber names, usernames, and screen names);

        ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii.   Local and long-distance telephone connection records;

        iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v.   Length of service (including start date) and types of service utilized;

        vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"); device make and model;

        vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

10

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

 i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS, and data; email addresses and IP addresses (including source and destination); and

 ii. information regarding the cell towers and sectors through which the communications were sent and received; and

 iii. per call measurement and timing advance data (PCMD, RTT, True Call, LOCDBOR, or similar)

c. All records pertaining to communications between **AT&T** and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, of violations of 18 U.S.C. §§ 1958 & 2(a) (murder for hire and conspiracy to commit murder for hire) and §§ 924(c)(1)(A)(iii) & 2(a) (discharge a firearm during a crime of violence) involving **LAWRENCE TURNER** during the period **February 21, 2021, to July 1, 2021**.